Al, we'll hear from Mr. K when you're ready. May it please the court. For 40 years, Zone 2B in the Horseshoe Bay South Subdivision of the City of Horseshoe Bay was zoned for manufactured housing, but it remained largely undeveloped. Then, around 2019, Legacy Housing Corporation, which is a publicly traded company that builds mobile homes and develops mobile home subdivisions, began acquiring lots in Zone 2B of Horseshoe Bay South with the goal and expectation of developing a mobile home community for working families. Shortly after Legacy acquired 297 lots, the City of Horseshoe Bay changed the existing manufactured housing ordinance. The only discernible purpose behind the changes that Legacy could discern was to thwart Legacy's plan of developing this neighborhood. How exactly did they change? They changed a bunch of things, Your Honor. They changed the requirements for whether there was a poured foundation. Previously, mobile homes could just be placed on footings, which is how they're designed. These things are— I thought, isn't that the change where a representative of Legacy appeared at the hearing and then said, we want some changes made, and changes were made to the ordinance and then Legacy said those are fine? I don't believe the record as it was developed is exactly that clear. Legacy's employees were involved when the changes to the ordinance were being discussed by the City Council. Foundation, skirting, driveways, setback was all at one time, right? Yes, Your Honor. April 13, 2021 was when the new ordinance was enacted. What you've discussed already, it seems to me, there's evidence in the record that that's Legacy's model, to have these sorts of poured foundations and to have more or less a permanent location for the modular homes. No, Your Honor. The record is clear. There's testimony in the record from Legacy's expert as well as fact witness testimony that these manufactured homes are designed not to be on poured foundations. There's no need for them. Legacy's expert was Kurt Hodgson. He's also the CEO of Legacy. He testified these products are designed to withstand hurricane force winds and be tied down and placed on temporary footings because the people who buy these things, sometimes they move and they take their house with them. So typically you don't have a poured foundation. The poured foundation requirement layers in a whole lot of cost and delay. First of all, it costs, you know, I think the record is approximately $10,000 to pour one of these foundations. Then you have to have a registered public engineer in Texas sign off on the design and the construction of it. The skirting requirement is a separate requirement. It has to be masonry skirting. It's not the same type of material that these homes are made of. And again, this product is built in a factory. They come plumbed and wired from the factory. Basically all you have to do is you put it down, you tie it down, you plug in the electrical, you plug in the plumbing, and you've got a house that's ready to go. Well, counsel, we can see what the record has about how many of these maybe the record supports were acceptable and approved by legacy and how many were not. If you're working with Penn Central now in your argument, you still need to show how that affected in a substantial enough way the value of your client's investment. I agree, Your Honor. And so the issue that we have is the magistrate judge ignored a whole lot of evidence that he'd already allowed into the record and he can't reconcile recommending the grant of summary judgment with that evidence. So the evidence that goes to your point is legacy's experts. There were two experts, but I'm going to focus on Kurt Hodgson. He identified the changes to the ordinance in his expert report, and then he specifically identified the diminution in value to legacy's property. His opinion was prior to the changes in the ordinance, the value of these lots is $60,500 apiece. After the enactment of the ordinance, the value of the lots is $5,000 apiece. That certainly is a substantial enough diminution in value, if accepted by the trier of fact, to qualify as a taking under the jurisprudence that's developed under Penn Central. Justice Stevens very famously wrote, I'm not sure if it was in the Chevron v. Lingle case, but he wrote, certainly you wouldn't say if the government occupies 100 percent of somebody's property, that's a taking, but if they only come in and occupy 95 percent of it, it's not. Counsel, I don't think the magistrate judge accepted that math, and I don't want to make this a math case, but it doesn't mean the magistrate judge did his own math wrong for some reason. And I think the evidence is pretty strong, you correct me if it's not, that the diminution was about, at most, 25 percent in the value, once you properly do the math on what these things would be selling for before and after the change. Respectfully, I guess I would disagree with that characterization. I think the valuation section of the expert report, which I looked at . . . Well, I'm talking about what the district judge found. I'm not . . . there's evidence, but what was the fact finding? Didn't the magistrate judge actually talk about in terms of 75 percent, but he did his math wrong, and it's only 25 percent? Well, I think he did his math wrong in a couple of places. He had done a . . . first, he started with the wrong valuation. He said that the legacy's evidence was that the pre-taking value of the lots was $35,000 apiece. The report that he . . . the report, which survived a Daubert challenge, to both its relevance and reliability from the same defendants before the same magistrate, set the value of those lots pre-taking at $60,500. So right there, you've got a, you know, almost 50 percent delta between what the expert said and what the magistrate thinks the expert said. So that was a mistake. Okay. But I think . . . I don't think the record is clear that the evidence was only a 25 percent diminution value. Well, we'll need to look at the evidence and the fact findings. You have several . . . you covered a lot of things, maybe 10 different objections. Let's not talk about all of them, but give me your old strips and gores discussion. I did an awful lot of real property work in Mississippi, and I never heard of strips and gores. I think that's a Texas aberration, but go ahead. I'm not aware of strips and gores being a doctrine in other states, but I can tell you . . . Let's hope not. . . . 25 years, you know, practicing in Texas, I'd never dealt with strips and gores before this case, and so I thought it was interesting, and I . . . So basically, your strips and gore is that this green belt itself has . . . is . . . fits within that. I don't know how much evidence there is about the green belt, but it seems to me the green belt has a purpose based on this record. You have issues about who owns it since King's Lion is not around anymore, and apparently it never conveyed that green belt. You can tell me if I'm wrong or not, this particular strip. But it does seem to me if it's still serving a purpose, I don't see providing this sort of undeveloped space all around the development, or at least somewhat around the development, why strips and gore analysis would apply. Well, there's several things you said, Your Honor, that are not in the record. There's no evidence of a purpose for the green belt in the record. The green belt is burdened by an easement for drainage and utilities, but that is all. How wide is the green belt? It is five feet, Your Honor. Five feet, so that's not much of a green belt. It's five feet right here. Is it wider in other places? No, it's not. But here's the key thing that the magistrate . . . well, there's two things the magistrate really got wrong. So, number one, the magistrate misread the cases on strips and gores to construe a reference to a plat in the deed that's in the chain of title to legacies lots as constituting a reservation. There's a case called Reeves v. Towery that we cited in the brief that is directly contrary to what the magistrate did. You can't look to the plat to constitute a reservation or a conveyance. You have to look to the deed itself, and there is no reservation nor conveyance anywhere in the chain of title in legacies deeds. But the whole point of strips and gores was, if you thought you were selling all the property and you omitted about five feet of it, that the courts would construe that you had the additional five feet, because otherwise it could seriously impair your access to the  That's exactly right, Your Honor. That's the purpose of the doctrine. Of the doctrine, yes. Yes, Your Honor. I'd like to address Judge Southwick's comment or question further about the purpose of the green belt. So a plat map is drawn by a developer before conveyances of deeds. The plat doesn't constitute a reservation or a conveyance. So the fact that a developer drew up a plat that has something called green belt on it doesn't mean that there was ever a conveyance of anything called a green belt, and the facts here are unrebutted. We've got affidavit proof and deposition testimony from two different witnesses proving up the chain of title, going all the way back to the original holder of title who sold to the developer. There was never a reservation or a conveyance in the deeds to which Legacy took the three lots that are separated by that five feet from this other 95 acres that Legacy owns. So Legacy's summary judgment proof is unrebutted, and there's a very recent case that we cited in the reply called Seeger v. Fry. It's a 2025 Texas Court of Appeals case. Directly on point, speaks to the burden on summary judgment. The facts are very similar to our facts. Where the proof is unrebutted, as it is in this case, Legacy's actually entitled to a reverse and render on this point. I don't understand who has standing to make this claim. Well, the owner who claims Nobody claims an ownership interest anymore. In other words, it's like, you know, the vacant prairie. And I just, I found it odd that either the city or the property owners association could try to enforce something to which they had no title. Well, I found it very odd, and that was obviously relevant to several of our other claims, where the city, the POA, and the resort are taking steps that are documented in the record from multiple witnesses to keep Legacy from accessing this greenbelt between its property, its lot, and its 95 acres. And then they all come on the record when I take their depositions and they say, well, gosh, we don't know who owns it. We talked to our lawyer. He couldn't figure out who owned it. The POA president, when I took his deposition, said, well, I thought we owned it. And then I went and looked at the title records. Turns out we didn't own it. Why don't we look at the extraterritorial jurisdiction? It seems to me you want more than five feet. You don't get anywhere if all you can succeed is on your greenbelt argument. So what about this ETJ that you crossed with the driveway? Again, the magistrate weighed evidence, rejected evidence, and assessed credibility in making his determinations that had to do with the ETJ. So basically this issue boils down to, did Legacy construct a driveway on its property or a road on its property? And did Legacy cross onto the greenbelt or not? Those issues were all disputed in the deposition testimony. Wait a minute. Okay, the road goes three separate pieces. One is one of Legacy's lots for a trailer home, right? That's where the road starts, the road or the driveway. Well, it has to because you've got to go from the internal streets in the subdivision somehow to get onto the greenbelt. If I can put a finer point on it, Your Honor, the city's characterization is incorrect of what the record shows. Legacy didn't build the street in the subdivision. That was there before this issue ever arose. And Legacy didn't build anything on the greenbelt. Legacy only built a driveway on its own property, which it was permitted to do. No, wait. Its own property was one of the lots that was supposed to support a manufactured home, right? Yeah, there were three lots adjacent to each other, and the middle one was the one that was the so-called driveway, right? No, Your Honor. Not exactly. Well, that was the picture I had from my thought, the record. What you're looking at is a plat, a picture on a plat. And so what you would see is a road... What I'm looking at is this. Yes, Your Honor. With the yellow. I don't know if it's in the reach of decorum for me to approach the bench or not, but if what you look at is that the lot in the middle that's highlighted...  Yes, Your Honor. That's not a road. That's a lot. So the road, those three lots are basically a cul-de-sac. So that lot is an empty lot right now. Right. There's no road on it. Then you've got this five-foot strip, unimproved land, green belt. And then over here you've got the 95 acres. The only thing Legacy built... But how do you get from the road within the subdivision out to the green belt and your ETJ deal? You don't because Legacy didn't do what the city says it does. So Legacy didn't pave over... The whole argument that the city and the defendants are advancing is that Legacy built a road across this green belt through one of its city lots onto its 95 acres. And that's just not what's in the record. What Legacy did is Legacy built a paved driveway from Highway 71, which is all the way over here, through its 95 acres, and then it stopped right here at the edge of Legacy's property. And there's a fence that was taken down and a gate that was erected. And there was competing testimony from multiple witnesses about whether that fence was on Legacy's property, which is what Legacy contends, or whether it was on the green belt. In fact, the city's witnesses testified when I took their depositions, they actually didn't know if the fence was on the green belt or not. So the testimony is unrebutted that the fence was on Legacy's property. Likewise, the testimony is unrebutted that the gate was on the 95 acres. So the whole issue about whether Legacy breached... This 95 acres over here has a development agreement on it. So it restricts what the owner can and can't do. So they can have a driveway, but it's got to be a residential driveway, not a commercial driveway. The evidence is undisputed that Legacy never built anything that crossed onto this 95... from the 95 acres onto the green belt. And Legacy's witnesses testified this was a driveway, and when the city's witnesses examined about it, she called it a road, but she couldn't provide any meaningful distinction between a road or a driveway. They said there's a yellow strip. It's two lanes with a yellow strip. Is that correct? I believe so. I'm not 100 percent sure, but those facts, when presented to the city's corporate representative in deposition, she could not identify that feature as constituting something that differentiated between a road and a driveway based on anything she could identify, anything in the city code, or anything she was aware of. So people can paint stripes on driveways if they want to. Do you concede that even if it was a two lane with a yellow stripe, that that would necessarily violate the development agreement? No, Your Honor. That would not violate the development agreement by painting a stripe on a driveway. I mean, the key here is the magistrate ignored unrebutted evidence that this was a driveway. So that's a fact question that should have been decided by a jury. I had another question about this, which has to do with footnotes about the... but I can't... I dropped this and I can't find them anymore. Had to do with talking about how long it took to get permits and whether Legacy had asked for variances for any... and the other, at least one of the other briefs says Legacy never sought a variance. There's testimony in the record. I've actually got a copy of the deposition excerpt right here that Legacy sought and was denied a variance. Okay. And then Legacy spends many pages on this business about what kind of approval the plumbers and electricians had to have. The issue with that is under this revised ordinance, the same traits people are treated differently depending on whether they're working on mobile homes or stick built homes. The problem is when Legacy hires a plumber or an electrician, they're considered a manufactured housing contractor. When a general contractor building a $5 million mansion on the lake hires a plumber or an electrician, they're not. All they have to do is have a state license and the state default insurance. Whereas Legacy's contractors, the same people, have to provide three letters of reference from people who have other projects that they've worked on. They have to pass a background check. They have to have $600,000 in liability insurance. They have to have all these things. Well, counsel, the magistrate judge addressed that. He don't agree with the decision made, but said the specific controls over the general, however, inartfully worded this particular change was made to the ordinance. He still said that the specific ordinances dealing with subcontractors would apply even if they're working on manufactured housing. You disagree with that, but it is what the M.J. found, correct? I disagree with that. I disagree with the basis for the finding. And also, I disagree that it was an issue that the magistrate should have resolved because, in practice, the city is— Isn't it a legal question of how to interpret the ordinance and that's proper for the magistrate judge? Well, if it's purely a legal question, then I suppose the magistrate judge could do so. However, I think the way the city is actually enforcing its ordinance is something that should be considered in terms of how the ordinance is constructed, and their mode of enforcement is consistent with the way legacies, witnesses, and the record construe the ordinance. Yeah, but I guess my point is, now that the magistrate has—would you agree that the way he interprets it is in your favor, your client's favor? I—no, I— Your subcontractor ordinance would be in your client's favor, right? No, Your Honor. The requirement that—respectfully, the requirement that a plumber who's working on a manufactured housing project has to have three letters of reference, but the same plumber who's working on a stick-built house on the lake does not, isn't in the legacy's favor because that's an additional burden that faces that legacy. Yeah, but you argued the whole thing in terms of your—Judge Southwick can help me out. You argued it in a different way than the magistrate judge understood it. You're arguing it as a distinction between the general contractor and the sub's requirements. That's what your brief is, as far as I could tell, but the magistrate judge says you're looking at it wrong. It's a subcontractor. Correct. And the problem is, these tradespeople are not considered subcontractors when they're working on manufactured housing. They're considered manufactured housing contractors. So this idea that they just fall into the subcontractor category— But now that the magistrate judge has ruled that they are subcontractors, they are bound—the other side is bound by that ruling, are they not? You won in the district court, magistrate judge, on this point. And you're trying to still show it's a disadvantage, but it does seem to me that you can't appeal that. That's a success for you. Not that it's a separate issue. It's all part of your overall mix. I'm not saying it's a separate issue. But you have time for rebuttal. We probably could get some benefit from the other side. I appreciate your time, Your Honor. Thank you. All righty. Mr. Sequist. Good morning, Your Honors. May it please the Court and my esteemed opposing counsel. I'm Gunner Sequist. I am here on behalf of the city of Horseshoe Bay. The magistrate's summary judgment order granted summary judgment to the city on legacies takings claim, and then affirmative summary judgment to the city on its affirmative breach of the development agreement claim. In a separate order previously, the magistrate had dismissed the conspiracy, equal protection, and due process claims. We argue in our brief, legacy has not properly raised those before this Court, or even if it had, doesn't articulate any colorable basis to disturb that. So I'm going to focus my time this morning on the affirmative claims that we were actually part of the summary judgment on. I'd like to start with the takings claim. And legacy is right. The M-1 zone in Horseshoe Bay has been zoned manufacturing housing for over 40 years, and it's still manufactured housing today. There is nothing in the city's ordinance that prevents it. How many trailer homes are on those lots? There are at least 40 or 50 that were already out there. In total, there are over 500 lots. Legacy has bought 292. There were 40 or 50 that were out there and have been there. What you have, Your Honor, just by way of background, is these had started being placed out there in the 70s. And so what the city undertook was a comprehensive review to try to put together some packages to, one, make sure that there were better accommodations out there. Do you know about 2021? It actually started in 2020, Your Honor. 20, okay. And so in terms of Your Honor's— Right after Legacy moves in, the city decides to change its ordinances. Well, they hadn't moved in yet, but they were starting to purchase some properties out there.  However, that didn't really come to their radar until Legacy came in. And Your Honor is absolutely correct, which is that the city gave Legacy its proposed changes and actually allowed Legacy to redline and propose those to the city council. And the council actually adopted the proposed changes to the foundation language that Legacy wanted. And so not only, Your Honor, did Mr. Hodgson and his associate, Mr. Major, did come to the council meeting and say, we're good with the permanent foundation language and these other requirements. Mr. Hodgson testified in his deposition that that was always a part of their plan to use permanent foundations. Would we disagree then from what opposing counsel said here today, that these changes are inconsistent with their business model? It is not, Your Honor. And Mr. Hodgson's testimony establishes that. And I would point the court to the deposition specifically at 3952, record 3952, where Mr. Hodgson explains that having a permanent foundation actually opens up HUD financing to them and increases the customer base that they have and the ability to get financing so that they can sell these homes. So he actually said in his deposition that the permanent foundation requirement did not conflict with their business model, didn't bother their business model at all. Let me ask you about a different change that we discussed a little bit with opposing counsel, and that is the idea that there's additional requirements on subcontractors on these manufactured homes that do not apply otherwise. The magistrate judge looked at both, said that the specific later, I think it's later, provisions dealing with subcontractors will apply, override perhaps odd language that was added to the general contract. But it seems to me that the two positions, provisions, are just inconsistent. And the judge had to make a decision and basically read out what was in, looks to me like legacy is correct. It seems to require greater requirements for subcontractors on manufactured housing. But the magistrate judge just said, here's how I'll read all this to make sense of it. Well, actually, Your Honor, it was the city's interpretation, advanced that, that the magistrate judge accepted. Okay, but I understand. But would you agree that just looking at the provision that they're complaining about, it does put that kind of burden on them? I do not. And you need the later language to sort of correct that. No, Your Honor. The subcontractor provision is the more specific provision, and it covers all the tradespeople that Mr. Kaye was talking about. And, in fact, that is not just the way the ordinance reads. That's the way the city's applied it. And so legacy has been able to, for each of the permits that it's requested, and the city has granted every one, apply simply by listing a state licensed electrician and plumber. That's exactly what they've done. You have to have the three references and a certain level of insurance and so on. Under, I'm sorry to interrupt.  Under state law, there are insurance requirements that they have to meet that are comparable to what the city requires for non-licensed people under those other sections. But, no, the city has not required legacy, and the applications are in the record. You're saying there is no evidence that these heightened requirements have been imposed for subcontractors working for legacy? Not at all, Judge. In fact, the opposite is just the opposite. Excuse me. The evidence is just the opposite of that, as the city has approved each of legacy's applications just by having them list a state licensed plumber and electrician. Now, what legacy has testified to is that they themselves had to get a manufactured housing registration, and that is true. But they testified that they were able to do that. But that obligation, Your Honor, is no more onerous than the registration requirements for a commercial contractor, which legacy would probably otherwise be. In fact, it's more favorable. The insurance requirements for a general contractor are $500,000 a million for a manufactured home contractor, not the subcontractors, but the trade subcontractors. But for the contractor, it's $306,000 to $100,000, which treats them the same as home improvement contractors who also have to register. So what the city has is a comprehensive and equal treatment. If anything, we've singled out legacy for more favorable treatment than we otherwise would if it had to register as a general commercial contractor. Just for my interest, how many people have moved into the manufactured home subdivision since these changes were made? I don't believe that number is in the record, Your Honor. What is in the record is that for each of the permits that legacy has applied for, the city has approved it and issued a certificate of occupancy, and legacy has sold those homes. So we know that at least— Well, that's only a pitiful number, like five or eight or something. But that's as many as they've tried to put in. Now, there are other—legacy is not, although I think it tries to suggest to places that it's the only game in town in terms of manufactured housing. That's not true. There are other folks who are putting manufactured homes out there. But, Your Honor, these requirements don't in any way limit the use of that area for manufactured homes. That's the purpose of it. And, in fact, if you— I don't understand. You said this zoning has been in existence for 40 years, 500 lots, and fewer than 10 percent of them actually occupied for that purpose. It sounds to me as if the—and the city's only been incorporated since 2005. So it sounds to me as if somebody really doesn't want manufactured home housing out there. I would look at it from the other way, Your Honor. I think it's really a demand issue. This is a little city. It's not very close to any major metropolitan area. I've been living in the city for 20 years. That's right. And so there's just— I'm not familiar with it. There's not just a ton of people that are looking to move out there into a manufactured home. I saw an overview photo when I looked at City of Horseshoe Bay because I always thought it was just a resort. I don't know that much. And there were houses all over the place and a population of less than 4,000 or something. Yes, Your Honor. And primarily a vacation community or retirement community. It's just that it's not a terribly active mobile home market. Maybe that's because you don't let people develop on the development agreement land. The only thing I would say to that, Your Honor, is that there is no evidence in the record of the city ever denying a permit. And so actually what the mayor said in that recording, and I know I'm getting off my time, but she was very complimentary of Legacy's products. You know, we—Horseshoe Bay— Why do you think that—I don't understand this lawsuit is the bottom line. Can we move on to the Greenbelt? Are you taking a position in the Greenbelt matter? No, Your Honor. To the extent there was any conspiracy claim against us, that was dismissed previously, and we assert it wasn't raised here. I do want to talk just for a moment in the last minute that I have about the breach of the development agreement. Of course, that development agreement was attached to the property before Legacy ever purchased it. They were subject to it. That's not in dispute. This whole argument of, well, it's a driveway versus a road is really semantics. It's never been the point. The city has never said the physical characteristics, although I agree with Judge Jones that I've never seen a driveway that's yellow-lined. But the physical characteristics aren't the issue. What the evidence is, and it's undisputed, that Legacy did was actually send out flyers to people saying, hey, we're offering you this exclusive opportunity to have roadway access through to Highway 71 across our property. And also, we're going to build a commercial amenity center there. And so that was the use that's inconsistent with what the development agreement is, which is either single-family or agricultural use, not commercial amenity to serve a development. And, Your Honor, not only did they send out that flyer, they made good on their promises. They started handing out those clickers for people to use. Well, how can you use them if there's no road connection? Well, that's where we disagree with my friend as well. And, in fact, there are pictures in the record that show, yes, they bulldozed through the fence. They put in a gate where the clicker operates it. And they put in, it's not a through-the-lot that Your Honor references, as you would have to do. They absolutely put in a cliche roadway through there. And they offered clickers for people to drive through there. And there's evidence that people used it. Counsel, with our presider's permission, is the Penn Central issue yours or the Homeowner's Association? The Penn Central issue is mine, Your Honor. We had a little exchange with opposing counsel on the effect on the valuation of their property by these changes. Can you help me with what the evidence is on what the potential diminution of value is? I absolutely can, Your Honor. And I think it's first important to note that the application of Penn Central is a legal question. Whether there has been a compensable taking or not is ultimately a legal question for the court. So while my friend on the other side would like to say it's a fact issue, that's really a legal determination. As far as the valuation goes, what the court found was not, was that Mr. Hodgson's number was not competent summary judgment evidence because it was premised on the false assumption that the lots were not capable of development. But the evidence in this case, there is no evidence that they were incapable of developing on those lots. The evidence is the contrary. They were able to develop every time they applied and tried. And to the extent there was some lot where they felt that they were unable to do so, which they haven't identified, there were options available to them, including the request of a variance, or platting lots together so that you could make a bigger lot out of two lots, which coincidentally they have since done in some circumstances. On the variance question, there was only one variance, and it was solely limited to the question of whether they could have a larger carport. But the house that they wanted to build fit on that lot without expanding the carport. And so the Zoning Board of Appeals found that that was not a legitimate basis for a variance. But they were able to still build that house. It's sitting out there now. Is there a number you would accept that you think the record supports of a diminution in value? I don't, Your Honor. And the reason being is that the evidence is — Did the Madison judge find there was a diminution in value? The judge found that if you take what Mr. Hodgson said is true, the diminution in value was in the 75 percent range, i.e. the lots were completely unable to be developed. The problem is, and the judge points this out, Legacy admits it purchased each of these lots at market value at $3,000 to $5,000. Even the ones that it sold because it decided it didn't want them undeveloped, it sold for three times what it paid for them. So I don't think there's any diminution in value either on the primary land and certainly not as it relates to the inability to develop a mobile home because there is no evidence in this case that they were not able to develop any mobile home. The evidence is the contrary. Every time they came to the city and said we would like to build a mobile home on this lot, the city processed that and approved it. All right, counsel. Thank you. Thank you. Mr. Krosnow. May it please the court. I'm here on behalf of the Applee Horseshoe Bay Property Owners Association. I'm going to address primarily the Strip and Gore Doctrine, although Ms. Lloyd may speak to it as well. For the record, I've been a Texas lawyer for 30-plus years, and I've never heard of the doctrine either, although perhaps I was asleep that day in first-year property law class. Why do you have standing on this matter? They're the ones claiming that they own this Greenbelt Strip via the Strip and Gore Doctrine. And so under the bylaws, the Greenbelt Strips are part of the common area that are reserved for the use and enjoyment of the owners. So as the Property Owners Association, we're usually involved in regulating the use of the Greenbelt Strips. But do you accept that there's no evidence that the Homeowners Association owns it, that the last title was in King's Lion and it doesn't exist anymore? There is no evidence that we can find that the Property Owners Association owns it. So isn't that part of what you need to show in order to make the assertions? Well, maybe. That you do have a claim. It's one thing, I mean, they're claiming things that people at that table are saying they shouldn't be claiming. It does seem to me the Homeowners Association may have a claim to the Greenbelt, but is it a viable claim? Well, and we're not claiming ownership. We're just contesting their claim. Some sort of rights that you can assert in this litigation. You are claiming some sort of rights that you are asserting in this litigation. It's not title, but it's something. So I guess I'm asking what is that something that you can stand on to use what Judge Jones has referred to? Well, they're trying to build a road through the Greenbelt Strip and then on to the property that we have an easement across the back lot line of it. So our standing is wrapped up in that, I believe, too. I'm not a property lawyer, never have been, but I know we own real property in Houston. And at the back of our property is an easement for utilities. And I don't see this Greenbelt is five feet wide, and it's an easement for water and electricity, evidently. And if Strip's and Gore's doctrine applies, then every property owner along that can make the same claim that Legacy does. Right? But the easement is still there as far as the property owners are concerned. So I'm not quite sure whether this is not a manufactured dispute, so to speak. Well, and the easement, to my understanding, is on the back lot line and is separate from the Greenbelt Strips that we are talking about here. Well, he seemed to say that, all right, whatever you say. All right, fine. Well, we'll divorce that. But nevertheless, if Legacy can claim the five feet of Greenbelt under the Strip's and Gore's doctrine, every other property owner can as well. What's wrong with that? In theory they could, but I do disagree. I don't think there's evidence in the record that every Greenbelt Strip is five feet. If you look at it on the plat, it looks like this particular one they're trying to build the road across may be somewhat smaller than the others. Does the Property Owners Association mow the grass? Do they maintain it in any way? Typically under the declaration, the Property Owners Association is in charge of maintenance of common areas. Now, my understanding, this Greenbelt is actually a wooded area, and I don't think there's any sort of maintained path through it or anything like that. It's just more of what's intended to be a buffer zone between this particular development so that people can't come up and build houses or whatever else right on the property line. Well, they can't because it abuts the extraterritorial jurisdiction. Right. It is a buffer zone between whoever owns the other property can't build right up to the property line. Most of us think of fences as buffer zones. Right. That is a type of buffer zone, but they put this one in. But my bottom line is why are you so concerned about five feet across three lots? Well, it's intended to be a continuous Greenbelt common area buffer zone. Greenbelt is only a name because it is actually an area of undeveloped land to which nobody claims ownership, dominion, control, or the right to even mow the grass. Right. But, you know, the record does show that a number of the other strips were conveyed by King's Land to the Property Owners Association. We're not claiming that we own it, but, you know, surely that was the intent here, and it didn't happen for whatever reason. But I don't think you can infer that they own it under the stripping gore doctrine just because we don't have proof that we own it. Also, is there any evidence in the record that any other part of this Greenbelt has been invaded by crossings of one sort or another, or is that just not in the record? That is not in the record. Okay. And King's Land did convey in some way some of this same Greenbelt, or is it some other development altogether? It's part of the continuous Greenbelt. The plot that was being waived here a little while ago that shows all these lots and the bottom part of it a strip of green, that's the only Greenbelt that King's Land has ever had anything to deal with? Or is there more than one Greenbelt in some other development that has become an issue? No, it's the Greenbelt shown on the plat, and there is evidence in the record, and I can give you the record sites, 2652 to 53, 2678 to 79, 2759 to 60, and 2785 to 2786, that in 1983, two years after two of the lots at issue were conveyed by King's Land, several years later King's Land conveyed 33 of the strips of the Greenbelt to the Property Owners Association. And my point being there that King's Land, the Greenbelt strips retained importance and value to King's Land at the time they conveyed it in 1981. I guess my question only was in this largely undeveloped part of Horseshoe Bay, perhaps not, talk about sometimes King's Land did refer to the strip and sometimes not. I want to make sure we're all talking, we're only talking about this same development, and there's not other King's Lands development, and we're just saying sometimes they retained the green space, sometimes they conveyed it, sometimes they ignored it. We're just talking about the one Greenbelt. Yes. All right. We are. And the other point. Let me ask you a question about the Homeowner Association. Frequently in these developments the HOA retains title to the community property itself. That's traditional. The rest belong to the owners. Using that appellation of the community property, are you saying that your Homeowner Association enjoys that property right, or the ownership? It does have title to at least on this record the 33 strips that I was referring to that are part of a continuous. It's really then what you'd like to find in most developments itself, the HOA retains certain community properties which are for benefit of the groups at large, et cetera. And that, of course, is then your standing to be here, I suppose. Yes, and for the use and enjoyment of the entire membership and not for one member to pave a road through it. Did that? What regulations does the HOA put forward, if any, with regard to the strip? Well, the bylaws say that it's for the use and enjoyment of the property owners, but that's all of the property owners, not just. Well, let's be clear about this. The major property owners at Horseshoe Bay are the people who have weekend homes that are pretty valuable. A lot of them are very, very nice homes. You don't represent the 40 or 50 people who occupy Horseshoe Bay South with 500 lots, 90% of which are not occupied. No. I mean, we represent the members. So your real concern, it seems to me, is that if this actually were to go through and connect with Highway 71, these lots might become more valuable because they would have a direct access to a major artery, whereas probably now, from the roads, you've got to wind in and out of Horseshoe Bay before you can even get to the 711. But does that make it more valuable or less valuable? Well, for the person who wants to sell homes for manufactured housing, it makes it more valuable. And the concern of the entire community is more the property owners' association's concern. I did want to make one other point substantively about the strip and gore doctrine, and I understand the court's concern about this is an unusual situation here with the property owners' association not being able to say that we own this Greenbelt strip. But under the case law, it's not just when you're looking at the strip and gore doctrine, you're not just looking at whether the strip is small in size but small in value in comparison to the land expressly conveyed. And my point there is there's been a lot of references to the record to a five-foot-wide strip, but there's not any evidence that I can see of what the value of the strip is, and I think that's problematic for legacies. The lots are 45 by 90 feet. Right. My point is about the value of the strips, and there is value to having a continuous Greenbelt strip. And at the time of the conveyance of two of these lots in 1981, Kingsland retained all of the other Greenbelt strips, or at least 33 of them at that time. So it did have access to the Greenbelt through that, and there was value there. Did the magistrate judge rule on that? The magistrate judge said that there was, reviewing the plat, that Kingsland had access through the Greenbelt strips it owned to the east and to the west. No, sir, I'm sorry. I meant with the argument that you just made that the value of the strips. I thought he sort of misperceived the relative size of the strips vis-à-vis the lot, or he seemed to interpret that you had to consider the whole Greenbelt vis-à-vis these lots. To answer, he did not address the value issue. Okay. And on the other one, I think he did both things. He looked at, if you look at his markings in his report and recommendation, he included a screenshot of the plat, and he drew a circle around the area he was talking about and he referred to it in his analysis, and it was three lots and then the three Greenbelt strips. He did make the larger point, I agree with you, so he did both, I think. He looked at that and said, it's not small in my eyes in comparison. The Greenbelt strips aren't small in comparison to these three lots. He also made the larger point that, and this really goes to whether there was any, you know, these strips retained importance for Kingsland at the time of the sale or whether there was a benefit or importance to them, that these were part of a continuous Greenbelt strip that Kingsland still had access to from the east and to the west, even if you assume that these three strips adjoining the lots, it couldn't have gotten to them through the lots. Thank you. MS. LLOYD. Good morning, Your Honors, and may it please the Court. My name is Jennifer Lloyd. I represent the Appalachian Horseshoe Bay Resort Development and Jaffe Interests. Horseshoe Bay Resort Development is the declarant under the Declaration of Reservations, which is applicable to the lots that Legacy purchased in the Horseshoe Bay South subdivision. I'm going to focus my argument on Legacy's appeal of the trial court's judgment that Legacy breached that declaration applicable to the lots and, in particular, lot K7156, which was the third lot of the three. So the trial court found that Legacy breached the declaration based on the following undisputed fact, that the declaration applied to the lots, that Legacy knew the declaration applied to the lots when it purchased those lots starting in 2019, that Legacy built either a roadway or a driveway that crossed the entirety of lot K7156, connecting 26th Street in the subdivision over the lot, the green belt, and connecting to the road built in the ETJ land, that Legacy's stated purpose in building that roadway or driveway, as Legacy stated in a letter sent out, was to provide direct access to Highway 71. That letter's in the record at ROA 2386. And that Legacy did not submit its plans for construction of that driveway on lot K7156 to the Architectural Control Committee appointed by the declarant. Now the declaration... What legal right does Horseshoe Bay have to enforce this? As the declarant, Section 5.6 of the declaration states that the declarant can enforce the declaration. What is the declaration? Oh, the declaration was established in 1971. It runs with the land on all of those 290 lots. You mean when all the land was originally purchased? Originally subdivided and created into plots and lots, the declaration was established in 1971, and it applies to all of those lots that Legacy purchased, and that was undisputed. And as declarant, we have the authority to enforce. The POA also has authority to enforce the declaration and its bylaws, but we are the party that brought an affirmative claim for breach of the declaration. Are the bounds of the city wholly within that area? Correct. The declaration actually predates the incorporation of the city, so we have authority of the declaration. The city ordinances also apply to those same lots once the city became incorporated. Let me ask you a question. What's so awful about allowing this, and leave aside the extraterritorial jurisdiction, pardon me, what's so awful about allowing a connection between South Horseshoe Bay and Highway 71? Well, the declaration requires that all those lots be used for single-family mobile home use, and thus allowing a developer, Legacy being a mobile home developer, to come in and take one of those lots for its own use rather than— This is supposed to be part of Horseshoe Bay South, but there are certainly not 500 lots there, and only 10% of 500 lots have been occupied in the past 40 years. And I assume the rest of this, I doubt there are meets and bounds or any kind of boundary lines. These are just—this is just a plat. This is nothing except maybe some infrastructure underground and a few roads. Is that not correct? I don't believe there's record evidence about which of those lots, all of those 297 lots that have been developed, but the evidence does show that Legacy submitted seven applications to the Architectural Control Committee. I don't care about Legacy. I'm just asking from the big-picture standpoint. Legacy may own almost half or more of these lots, but so far, Horseshoe Bay South, as I understand it, must be largely green space. Is that fair to say? I don't know that there's record evidence on that. I think everyone has— I mean, you represent them, so just tell me. Well, I mean, I can look it up on Google Maps if I need to, but— They're all platted, and there are—I looked it up on Google Maps yesterday. You can actually see Legacy's road, and you can see houses throughout there, mobile homes. And I think the declarant has much of an interest in developing those lots consistent with the declaration for mobile home use, but it is undisputed that Legacy did not use lot K7156 for mobile home use. The declaration requires that. The declaration also requires that any improvement has to be submitted to the Architectural Control Committee. Legacy submitted seven applications to the Architectural Control Committee. They were all approved, and they did not submit this road. So based on those undisputed facts and the unambiguous declaration, the trial court affirmatively found that they reached the declaration and granted us appropriate relief as declarant. Regardless of whether the Legacy can establish some ownership of that strip under the strips and gores doctrine, there is still a violation of the declaration. Based on the same facts, the court also found a violation of the development agreement, which is on the adjoining land, both of which had limitations to single-family home, and then the development agreement was agricultural or timber use. Well, it's not clear to me that just the road, even if it's got a yellow strip on it, necessarily violates that declaration. Well, if Legacy had not sent out a letter saying that its intent was to connect 26th Street with direct access to 71, this might be a different case. No, that's not what you're concerned about. What you're concerned about is that Legacy might try to develop part of that extraterritorial area for purposes other than agricultural or single-family use. That is the city's claim because they are the party under the development agreement. We are the party under the declaration that applies only to the lands we have no interest in. But the magistrate judge found the same set of facts established a breach of both, and those facts were undisputed, and thus Legacy did not create a genuine issue. Now, my time is up, but I do ask that the court ‑‑ I'm letting everyone else go over so we can have another comment. Well, my other comment is, regardless of whether Legacy owns that strip, there's independent bases for denial of the conspiracy and negligence claims, which they also brought against the POA and the declarant. Who is your client? Horseshoe Bay Resort Development, which is the declarant, and Jaffe Interest, which is a related entity. Is that structured under the Homeowners Association? No, the Homeowners Association is a different entity. How do you relate to the HOA? We don't. The HOA is an independently elected board of homeowners. We are the declarant, which has the authority to enforce ‑‑ The HOA doesn't own any property. The HOA, excuse me? There is no community property owned by the HOA. No, or rather the POA. Yes, the POA does own common areas throughout the Horseshoe Bay South subdivision. You're talking about the common area, and it's not the subject of any of these. It's not been so divided into these lots. I'm having trouble putting together your roles. Our role, we help maintain through a related entity. We help maintain the common areas. You're the original landowner for all of this, right? The developer in 1971 through assignment. And it sold this land, right? King's Land sold certain lots, correct. But now we help maintain the common areas through a maintenance fund, which is one of the complaints they made, which is in the declaration is we get a portion of the maintenance fund to help maintain the common areas. But there are common areas owned by the POA, not by the declarant or the resort. Let me ask you a historical question. It sounds to me as if Horseshoe Bay really doesn't favor manufactured housing, because if they favored it, they'd be cooperating with legacy and one variance in 500 lots is not going to mess things up and so on and so forth. When this was originally zoned for manufactured housing, was there a tax benefit to doing that or a Fair Housing Act requirement or something in connection with the larger development? I'm afraid I don't know the answer to that, Your Honor. I do know that the mobile home portion of the subdivision was created in 1971 as a supplement to that declaration. So there's the Declaration of Reservations, and then the supplement creates the mobile home district and established that lots. And so I don't know if there was a tax benefit at the time, but I don't think there's any evidence that we don't support development of those lots consistent with the declaration. I think given that there is a maintenance fee that is derived from those lots that is paid a portion to the POA and a portion to us under the declaration, I think it's to our benefit if those lots are developed consistent with the declaration. Okay. Thank you, Your Honor. I appreciate the time. Now, Mr. Kaye, technically you have five minutes, and I'm not going to give you much more than that, so try to get your points. Yes, Your Honor. May it please the Court, Judge Jones, you asked if there was any evidence that Legacy can't develop its homes. I would assert that the fact that a publicly traded company that's in the business of developing manufactured housing has only been able to sell three homes in four years is evidence that answers that question. All of the points that the city's lawyers raised were disputed in summary judgment proof. The magistrate judge made the same error throughout this case. He weighed evidence and rejected certain evidence. It should have gone to a jury. With regard to the question about whether there was a tax benefit for having certain properties owned as manufactured housing when that was first done, I don't believe the record was developed about that. I'd be surprised if there wasn't a tax benefit. What relief do you seek from this Court? We seek reverse and remand on all issues, except we seek reverse and render on our declaratory judgment. Reverse and remand for what? Beg your pardon? Reverse and remand for what? For trial before the jury on all of our claims, except for our declaratory judgment claim about strips and . . . What's the jury question? Well, I don't have the charge in front of me, but . . . Well, if you're going to try a jury case, you better know what the question is going to be. Yes, Your Honor. I think the amount of the diminution in value would be a question of fact. There's competing evidence, or at least there was evidence that Legacy asserted, about the diminution in value that was a direct result of this scheme. The diminution in value, you're talking about a taking? Yes, Your Honor, for the takings. And then for the declaratory judgment claim about the assertion of the strips and gores doctrine, I think I would assert that we have actually met every element to show that we're entitled to a judgment, that we own the property under the strips and gores doctrine, so that should be reverse and render. But if it was remanded, the only question that a jury would have to answer would be whether the size of the strip that Legacy seeks title to is relatively small in relation to Legacy's lots. And the case law that we have cited states that you can have a strip that is up to 60% of the size of the titled land, and that can still be considered relatively small. It doesn't do you any good, of course, unless you also get the approval of the extraterritorial jurisdiction roadway. Well, if you're talking about it as a practical matter, maybe yes, but actually I think respectfully I think that's irrelevant to who owns the land. Legacy owns the land under the law. I understand, yes, but it still won't get you anywhere. Well, respectfully, I think it would get us somewhere with regard to some of our other claims, which is we've asserted negligence claims against the defendants for interfering with our use of what we contend is our own property. So what I'm really trying to get at is you have not said a word here in defense of the claim that you violated the use for limitations in the extraterritorial jurisdiction. The basis that the defendants asserted against us in their counterclaims, saying we breached that development agreement and violated those restrictions, they say we built a road, but we've got testimony that we built a driveway. And that is a question of fact. A jury would have to decide whether that was a road or a driveway. Separately, there was discussion from counsel for the POA about whether Legacy actually crossed the road, crossed the strip. Well, obviously there's already evidence in the record we've talked about that we didn't build a road. We didn't pave over the strip. He said it was undisputed that they built a caliche road. That is very much in dispute, and I would submit that the photos in the record don't depict a caliche road. They just depict dirt. But then separately, there was discussion of these clickers saying, oh, you didn't just talk about it. You actually distributed these gate openers to other people. Well, what Legacy did is Legacy sent out a flyer that talked about what they wanted to do in the future. They wanted to provide access and amenities in the future. I don't think there's anything wrong with Legacy trying to drum up support among the people who live in this neighborhood to try to go to the POA and say, hey, why are you stopping these guys? They want to put in a pool and a playground and a park, and they're getting nothing but the stiff arm from everybody involved here. And so that was a disputed issue of fact about whether Legacy did anything to cross the road or violate that development agreement. And then with regard to the magistrate's error in the application of the strips and gores doctrine, there was a question about whether the magistrate ruled on the value. The magistrate's ruling did not take the valuation into consideration. He only discussed whether the plat was a reservation. Okay, he said that. Okay. Thank you, Your Honor. All right. Thanks a lot. All right. We'll call the third case of the morning.